## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **CYNTHIA ROBINSON PERIGO,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **4:17-CV-00242-KOB** |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | |
| **Acting Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On June 6, 2013, the claimant, Cynthia Robinson Perigo, applied for disability insurance benefits under Title II of the Social Security Act. The claimant alleged her disability began on June 6, 2012, because of her rheumatoid arthritis, fibromyalgia, left knee surgery, need of right knee surgery, back problems, depression, anxiety, and swelling in the wrists. The Social Security Agency denied the claim on September 19, 2013. The claimant filed a request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on April 15, 2015. (R. 21, 88,104, 112).

In a decision dated August 21, 2015, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was ineligible to receive Social Security benefits. The Appeals Council denied the claimant's request to review the ALJ's decision on December 27, 2016. Consequently, the ALJ's decision became the final decision of the Commissioner of Social Security. (R. 1–3, 43). The claimant has exhausted all of her administrative remedies, and this

court has jurisdiction pursuant to U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court REVERSES AND REMANDS the decision of the Commissioner to the ALJ for reconsideration.

## II. ISSUE PRESENTED

Whether the ALJ's reasons for discrediting the claimant's subjective complaints about the limiting effects of her pain and mental impairments lack substantial evidence.[1]

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the

---

[1] The claimant presented other issues, such as whether he improperly discredited the opinion of her treating physician Dr. Chindalore, but the court does not reach the substance of those issues. The court advises the ALJ to re-evaluate those issues in light of this court's decision.

determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court disagrees with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

The claimant's attempt to establish disability through testimony about her pain and limiting effects of her impairments must satisfy the Eleventh Circuit's pain standard. The pain standard requires that the claimant have an underlying medical condition that either (1) has objective medical evidence supporting the severity of the pain the condition causes *or* (2) the medical condition is of such severity that it could reasonably be expected to cause the claimant's pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

The claimant may use subjective testimony to support her claim of disability under the pain standard if substantial evidence supports that testimony. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). In addition to the claimant's testimony, the ALJ may also consider the claimant's daily activities, treatment history, and other relevant factors. *Harwell v. Heckler*, 735

F.2d 1292, 1293 (11th Cir. 1984); 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). The ALJ may

consider the claimant's ability to perform certain activities of daily living (ADLs), as well as the

impact of such activities on the claimant's credibility. 20 C.F.R. §§ 404.1529 (c)(3)(i),

416.929(c)(3)(i); *see also Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987) (finding that

ADLs may be relevant to the fourth step of the sequential process).

The ALJ will also consider any inconsistencies between the claimant's testimony and other

evidence in the record to determine if the claimant is disabled or not. 20 C.F.R. §§

404.1529(c)(4), 416.929(c)(4). If the ALJ discredits the claimant's subjective testimony, such

discrediting must be obvious to a reviewing court and adequately reasoned. *Dyer*, 395 F. 3d at

1210. The ALJ must articulate reasons for discrediting the claimant's subjective testimony and

substantial evidence must support those reasons. See *Brown v. Sullivan*, 921 F.2d.1233, 1236

(11th Cir. 1991).

## V. FACTS

The claimant was forty-three years old at the time of the ALJ's final decision. The claimant

has the equivalent of a high school education and past relevant work as a certified nursing

assistant, cleaner/housekeeper, production line worker, and cashier. The claimant alleges

disability based on her rheumatoid arthritis, fibromyalgia, left knee surgery, need of right knee

surgery, back problems, depression, anxiety, and swelling in the wrists. (R. 41–43, 88).

*Physical Impairments*

From 2009 to 2015, Dr. Rommel Go at Med-Assist treated the claimant for multiple physical

ailments and problems starting with arthritis on February 23, 2009. He prescribed Mobic for her

pain. The claimant returned to Dr. Go on April 23, 2009, complaining of pain, and he prescribed

her Lortab. In her visit with Dr. Go on August 24, 2009 the claimant said she heard a popping

sound in her right knee when she walked and it hurt; Dr. Go continued her on Lortab. On October 6, 2009, Dr. Go diagnosed the claimant with a ligament tear in her left knee and referred her to orthopedic surgeon Dr. Joseph Kendra. (R. 355–360).

Dr. Kendra saw the claimant on October 16, 2009, diagnosing her with a possible meniscal tear and posterior lateral complex injury in her left knee. Dr. Kendra performed an arthroscopy on the claimant's left knee on October 26, 2009; he reported no complications and said she was doing well. During her follow-ups with Dr. Kendra, the claimant revealed that she still felt some discomfort in her knee at night but requested that she be allowed to return to work. Dr. Kendra prescribed her Lortab and encouraged her to do knee strengthening exercises. (R. 273–75, 309–10).

Between December 21, 2009, and May 3, 2011, the claimant returned to Dr. Go seven times for chronic lower back pain, pain in both of her knees, painful movements, tingling and numbness in her hands, and hand pain. Dr. Go prescribed her Lortab and Mobic to treat the pain. On December 10, 2010, Dr. Go reported noted the claimant's weak hand grip. (R. 346–54).

On August 30, 2011, a doctor at Med Assist diagnosed the claimant with a ganglion cyst on her right hand and the claimant requested a referral for her hand pain; the doctor's report also indicated the claimant had paraspinal tenderness in her lower spine. The claimant reported that her current medications worked to control her symptoms. During her November 11, 2011 appointment with Dr. Go, the claimant complained of migraines and requested a referral to Dr. Kendra for her knee pain; Dr. Go prescribed her Imitrex for her migraines referred her back to Dr. Kendra. (R.345 –46).

On February 9, 2012, after physically examining the claimant and ordering an MRI, Dr. Kendra determined that the claimant might have an internal derangement in her right knee and

advised her about an arthroscopy. Dr. Kendra also indicated that a doctor diagnosed the claimant with rheumatoid arthritis in 2008 and treated it with Mobic. Dr. Kendra scheduled the claimant for right knee surgery, but the claimant testified at the ALJ hearing that she cancelled the surgery when she lost her job and insurance. (R. 271–72).

On March 2, 2012, Dr. Go advised the claimant to have the arthroscopy on her right knee to alleviate her pain. The claimant saw Dr. Go for her chronic lower back and knee pain and migraines on June 8, 2012; she reported that she was "doing well," but Dr. Go reported that she had paraspinal tenderness around her L5 vertebra. On September 5, 2012, the claimant returned to Dr. Go for back and knee pain and swelling and pain in her hand; he indicated on her chart that a Dr. Phillips had diagnosed her with rheumatoid arthritis in 2007. Dr. Go prescribed further treatments of Lortab and Mobic for the claimant's arthritis and pain. (R. 342–344).

During her follow-up appointment with Dr. Go on December 3, 2012, the claimant indicated that she felt no drowsy side effects of her medication and was able to do activities of daily living with her pain medication. However, the claimant still reported experiencing chronic lower back and joint pain. Dr. Go continued her on Lortab, Imitrex, and Mobic, but also started the claimant on Neurontin. On March 4, 2013, the claimant again reported to Dr. Go that she had no side effects from her medication and that it allowed her to do daily living activities. But she complained about not losing weight with diet and exercise alone and wanted to try a new diet medication. Dr. Go added obesity and dyslipidemia diagnoses to the claimant's conditions; assessed her other conditions as unchanged; continued the claimant on her previous medications; and added a Drisdol cap to treat her Vitamin D deficiency. (R. 336–41).

On June 4, 2013, the claimant reported to Dr. Go that she experienced burning sensations in her left arm and asked for a referral to a rheumatologist for her knee pain; she also reported no

change in her chronic lower back and joint pain. She also reported that her pain medication allowed her to do activities of daily living; reduced her pain 30%; and caused no negative side effects. She asked that her medication dosages not be reduced. (R. 332–35).

On June 27, 2013, the claimant completed a pain questionnaire for the Disability Determination Service. She reported experiencing pain since 2006 and that it primarily affected her back, both knees and wrists, ankles, and upper left arm. She said her pain is constant; occurs when she sits, walks, or stands for too long; and uses her hands to drive or lift items. She reported taking one 100mg dosage of Neurontin and four 7.5mg dosage of Hydrocodone a day; this medicine relieved her pain for about two hours at a time. She also reported that pain affected her ability to work, sit, stand, walk, write, and drive. (R. 197–98).

The claimant returned to Med Assist on July 2, 2013 for back pain; reported no new problems; and stated that her medication adequately controlled her pain. The nurse practitioner who saw the claimant noted that the claimant needed close monitoring because of inconsistencies in her urinalysis results.[2] (R. 331).

On July 1, 2013, the claimant's mother filled out a function report about the claimant's disability. She wrote that the claimant did laundry and cleaned the home a couple of times a week, prepared small meals with the help of her daughters, and attended church. She also wrote that the claimant rarely left the house besides attending church, going to doctor appointments, or grocery shopping. She reported that she drove the claimant most places and that the claimant "can't walk good." She said the claimant had trouble squatting, walking, bending, and standing because of her knee pain; she estimated that the claimant could walk "maybe one hundred yards" and must rest for twenty minutes afterwards. She said the claimant could follow instructions, had

---

[2] On June 8, 2013, the claimant's urinalysis report indicated she took Klonopin, a medication used to treat seizures and depression, but no records indicated the claimant had a prescription for this drug at the time. (R. 464).

no problems concentrating, and gets along well with authority figures; however, she also stated that the claimant does not handle changes in routine well and gets mad about her inability to work and care for herself. (R. 211–16).

On July 14, 2013, the claimant completed a self-function report for the disability services office. In her self-function report, the claimant stated that she watched television and was able to engage in self-care behaviors and activities like bathing, dressing, and cooking small meals in a microwave, but experienced pain while doing those activities. Specifically, she experiences pain while squatting, standing, raising her arms, and lifting things. She said her pain keeps her awake at night. The claimant corroborated her mother's report about the cleaning and leaving the house. She said she follows direction fine and has no problems with concentration, but does not handle stress or changes in routine well; she also reported that she sometimes cried without reason and had panic attacks. (R. 218–24).

On July 31, 2013, nurse practitioner Tonya Moses at Med Assist noted in her records that the claimant was taking Mobic for her arthritis, Imitrex to control migraine headaches, Lortab for her lower back and knee pain, and Neurontin for nerve pain. The claimant again reported that her medication caused no negative side effects; adequately controlled her pain; and allowed her to do activities of daily living. Nurse practitioner Tonya Moses warned the claimant about abruptly stopping medications and reminded her that the goal of pain management treatment was to get her pain to a level where she could function, not the complete elimination of her pain. (R.464–66).

After the claimant requested a referral, Dr. Vishala Chindalore, a rheumatologist, treated her from August 2013 until March 2015. In her first visit with the claimant on August 9, 2013, Dr. Chindalore reported that the claimant was taking a hydrocodone-acetaminophen tablet in

addition to Lortab and Mobic. The claimant reported feeling morning stiffness lasting one or two hours, fatigue, and painful joints. Dr. Chindalore believed the claimant showed classic symptoms of osteoarthritis, fibromyalgia, and possibly rheumatoid arthritis. She recommended that the claimant start exercising and prescribed prednisone to treat the claimant's joint pain. (R. 428–431).

At the request of the Social Security Administration, Dr. Ronald Borlaza performed a consultative examination of the claimant on August 17, 2013. The claimant reported that she could clean, do laundry, prepare small meals, make her bed, and take care of personal hygiene needs, but she relied on her mother to do other chores. Dr. Borlaza noted eleven fibromyalgia pain points on the claimant and diagnosed her with rheumatoid arthritis, fibromyalgia, chronic bilateral knee and ankle pain, neuropathy with unknown etiology, and depression/anxiety. He assessed that she could stand and walk for no longer than four hours at a time and that she could frequently lift or carry twenty-five pounds. (R.378–382).

Between August 26, 2013 and July 11, 2014, the claimant had eleven follow-up appointments with Dr. Go and/or Dr. Chindalore for treatment of her chronic lower back, knee, and joint pain. On August 26, 2013, Dr. Chindalore started the claimant on methotrexate to treat her joint pain. During this time, the claimant rated her pain as high as an eight and as low as a four on the pain scale; reported feeling fatigued; had morning stiffness lasting between five minutes and two hours. Except on November 6, 2013 when he stated that the claimant's arthritis was not doing well, Dr. Chindalore described the claimant's rheumatoid arthritis as doing well and her osteoarthritis stable; her arthritis as moderate in severity; and often advised the claimant about proper diet and exercise. The claimant reported to Dr. Go that her medications caused no negative side effects and adequately addressed her pain; he assessed her chronic back pain as

unchanged. On March 14, 2014, Dr. Go prescribed Norco to treat the claimant's pain in addition to Imitrex, Mobic, and Neurontin. (R. 413–27, 451–66, 470–72).

On August 1, 2014, the claimant reported to Dr. Go that her medications no longer adequately managed her pain and requested an adjustment in her dosages and prescriptions; Dr. Go noted that he would increase her pain meds. He also noted that the claimant's lumbago and rheumatoid arthritis had deteriorated since her previous visit on May 1, 2014. During her appointment with Dr. Chindalore on September 12, 2014, the claimant reported dull and throbbing pain, morning stiffness lasting fifteen minutes, and fatigue. Dr. Chindalore, however, noted the claimant was doing well on her medications and again described her osteoarthritis as stable and rheumatoid arthritis as doing well. (R. 524–30, 604–07).

When the claimant returned to Med Assist on October 1, 2014, she reported that her pain medication again adequately addressed her symptoms and denied experiencing any negative side effects. Nurse practitioner Sabrina Thomas assessed the claimant's conditions as unchanged; noted that the claimant was not taking her vitamin D supplements; and instructed her to take her prescribed medications. Between November 14, 2014 and January 20, 2015, the claimant saw Dr. Go or Dr. Chindalore for four more follow-up appointments. She reported to Dr. Go that her pain medication adequately addressed her symptoms; allowed her to do daily activities; caused no negative side effects; and reduced her pain 30% but still reported no changes in her lower back and joint pain. Dr. Chindalore continued describing the claimant's rheumatoid arthritis as doing well and her osteoarthritis as stable. (R. 597–03, 558–61, 626–30, 647–50).

On March 6, 2015, the claimant returned to Dr. Chindalore's office for a follow-up visit. Dr. Chindalore described the claimant's osteoarthritis and rheumatoid arthritis as doing well; added chronic pain syndrome to her diagnoses; and noted that she was doing well on narcotic pain

medication. On this same day, Dr. Chindalore also completed the claimant's application for a disability parking pass, indicating that the claimant could not walk more than two hundred feet because of her arthritis. (R. 621–625, 636).

In Dr. Go's last report in the record, dated March 19, 2015, the claimant reported that her medications adequately treated her pain with no adverse side effects and that they allowed her to do her activities of daily living. She did complain of a headache on that visit, but Dr. Go indicated that she has been migraine free for over a year. He also encouraged the claimant to start taking generic drugs for her pain. (R. 684–687).

*Mental Impairments*

In addition to her physical problems, Dr. Go also treated the claimant for depression and anxiety disorders. On February 28, 2009, Dr. Go diagnosed the claimant with generalized anxiety disorder and prescribed Celexa and Xanax to treat her anxiety and panic attacks. On April 23, 2009, the claimant reported that she had nine panic attacks since the last visit despite being on medication. Dr. Go refilled the claimant's Xanax and Celexa prescriptions on June 22 and August 24, 2009 and her Xanax on October 6 and December 21. (R. 354-60).

On April 23, 2010, Dr. Go diagnosed the claimant with severe depression and added Abilify to her medications. The claimant returned to Dr. Go on June 6, 2010, still reporting severe depression, and he prescribed her Seroquel. On August 6, 2010, the claimant returned to Dr. Go for pain and depression; he continued her on Celexa, Xanax, and Seroquel. On December 10, 2010, the claimant complained about her generalized anxiety disorder, and Dr. Go continued her on Xanax. Dr. Go refilled the claimant's prescription for Celexa on March 4, 2011, and her prescription for Xanax on May 3. On November 30, 2011, Dr. Go refilled the claimant's Xanax and Celexa prescriptions. On March 2, 2012, Dr. Go continued diagnosing the claimant with

generalized anxiety disorder but his notes indicated that her primary complaint was knee pain. On his June 8, 2012 report, Dr. Go did not mention any of the claimant's mental problems, noting that her primary complaint was pain. (R. 343–53).

On September 5, 2012, the claimant reported to Dr. Go that her depression started in 2006 but that Celexa helped; she also reported that she had a panic attack two days before the appointment where she "felt like she couldn't breathe." Dr. Go continued her on Celexa and Xanax and instructed her to return to the clinic in three months. On December 3, 2012, the claimant reported her psychiatric medication adequately controlled her anxiety and depression. On March 4, 2013, the claimant told Dr. Go that she was taking her Xanax but her urinalysis indicated she had not taken it in two days; although the claimant complained of anxiety and panic attacks, Dr. Go assessed her anxiety as unchanged. The claimant told Dr. Go on June 4, 2013, that she was doing well with her anxiety; was not having panic attacks with the medication; reported no major side effects from the medication; was able to handle daily stressors better; and rested better. On July 31, 2013, she reported to nurse practitioner Tonya Moses at Med Assist that her anxiety was well-controlled with her medication. (R. 332–42, 464–467).

In October 2013, the claimant began receiving treatment and therapy for her anxiety and depression from Quality of Life at the Roberta O. Watts Medical Center under the direction of first Dr. Ochuko Odjegba and later Dr. Marilyn Lachman. In her first visit at Quality of Life on October 21, 2013, the claimant reported to Dr. Odjegba that she started experiencing depression in 2005; had difficulties with sleep, restlessness, and excessive worry; experienced fatigue and feelings of guilt; had diminished pleasure and difficult functioning; and that Celexa no longer

worked for her. Dr. Odjegba noted the claimant was in a depressed mood and that she cried during the interview; Dr. Odjegba prescribed the claimant Viibryd. (R. 383–87).

At the follow-up visit at Quality of Life on November 11, 2013, the claimant reported improvement in her symptoms, specifically that she was crying less and had more energy. However, she also indicated that she still felt anxious and requested her Xanax be refilled. Dr. Odjegba noted the claimant had improved affect and mood, but added hydroxyzine to her medications. (R. 388–91).

On November 14, 2013, the claimant told social worker Kristy Phillips that she started experiencing depression after a miscarriage and that her depression had worsened over the last seven years. She told Ms. Phillips that she drove her car off the side of the road in a suicide attempt in 2011; sometimes had suicidal thoughts; and experienced crying spells, sadness, and hopelessness because of her inability to work. Ms. Phillips administered to the claimant the PHQ-9 tool that indicated she had twenty-seven severe depressive symptoms; Ms. Phillips also reported that the claimant had a Global Assessment Functioning score of 50, indicating she had severe symptoms. The claimant made plans to begin regularly seeing Ms. Phillips for therapy. (R. 392–94).

During her appointment with Dr. Go on December 2, 2013, the claimant reported worsening depression and crying. Dr. Go assessed the claimant's anxiety and depression had deteriorated since her last appointment, but noted that she had no suicidal ideation and was going to start regularly seeing a therapist for counseling. Dr. Go decided to increase the claimant's nerve meds. (R. 458–60).

On December 12, the claimant reported to Ms. Phillips that she had feelings of hopelessness and thoughts "that she would be better off dead"; that family and friends had noticed a change in her behavior; that she was crying a lot; and that she rarely left the house. (R. 395–96).

On January 6, 2014, the claimant reported to Dr. Odjegba that she was unable to exercise because of pain in her knees but that her depression was doing fine on medication. Dr. Odjegba encouraged her to start exercising to help with her depression and weight gain. During her session with Ms. Phillips on January 13, 2014, the claimant said she still suffered from depression and panic attacks; felt useless because she could not work; and experienced hopelessness, loss of appetite, sleeplessness, social withdrawal, and concentration problems. Ms. Phillips described the claimant as having a low affect and depressed mood and assessed the claimant with a GAF score of 50. On January 13, Dr. Odjegba described the claimant's depression as stable with medication and noted that she was doing well; he also advised the claimant to start walking thirty minutes a day to combat her depression and weight gain. (R. 397–408).

On February 10, 2014, the claimant reported to Dr. Go that her depression was better on Viibryd; she had lost five pounds walking daily; and that she had no negative side effects from her medication. When the claimant returned to Dr. Go on March 4, 2014, she reported that her anxiety and depression had improved since the December 2, 2013 visit; that Viibryd helped her depression; and that she was resting better with Seroquel. Dr. Go assessed that her anxiety and depression had improved and continued her medications. (R. 455–57, 473–77).

During therapy with Ms. Phillips on March 10, 2014, the claimant reported suicidal ideation, hopelessness, insomnia, frustration, agitation, and lack of motivation. Ms. Phillips indicated the claimant's depression was severe; she had agoraphobia with panic disorder; and her GAF score

was 50. However, on that same date Dr. Odjegba described the claimant's affect and mood as appropriate; indicated improvement in her depression; and continued her medications. The claimant, though, reported to Dr. Odjegba that she had some difficulty functioning. (R. 478–85).

After the claimant experienced a death in the family around April 15, 2014, Ms. Phillips reported that the claimant's depression symptoms worsened again, and Dr. Odjegba noted she was pretty upset over the death and not losing more weight. During this session, the claimant told Ms. Phillips that she had urges to cut herself but did not; that she struggles with depressive symptoms daily; and that she gets up even when she does not feel like it. Ms. Phillips reported the claimant had a somber mood and a GAF score of 50. (R. 486–92).

During her May 1, 2014 visit to Med Assist, the claimant reported that she had no side effects from her medication; that she was not having panic attacks with it; and that she could handle daily stressors better. On May 12, 2014, Ms. Phillips reported no change in the claimant's mental status but indicated that the claimant was going through a break up after dating someone for three months. She told Ms. Phillips that her ex-boyfriend called her "crazy," which made her want to cut herself. (R. 451–54, 498–500).

On July 7, 2014, Ms. Phillips noted no change in the claimant's mental status, but reported that the claimant had new stress because one of her daughters needed surgery and the other one was trying out for the volleyball team. The claimant admitted that she scratched her arm with a nail and requested more Seroquel; Ms. Phillips reported the claimant had a GAF score of 50. (R. 519–21).

Dr. Go saw the claimant on August 1, 2014 and assessed her anxiety as unchanged. He noted that she was doing well on her medication; had no side effects; and could handle daily stressors better. On August 15, 2014, the claimant told Ms. Phillips that she had good and bad days but

mostly bad ones. Ms. Phillips noted the claimant had a GAF score of 53 and that she was busy with her daughters starting school. (R. 585–87, 604–07).

On August 15, 2014, Ms. Phillips wrote a letter for the claimant's previous attorney, Kermit Downs, stating that the claimant's depression and anxiety prevented her from engaging in substantial gainful activity. Ms. Phillips stated that she had provided counseling to the claimant for nine months and would continue doing so until her symptoms became manageable. She said the claimant had classic symptoms of major depressive disorder and panic disorder with agoraphobia, including feelings of sadness, irritability, insomnia, racing thoughts, low self-worth, low energy, hopelessness, and that she rarely left the home. (R. 514).

On September 18, 2014, the claimant still reported struggling with sleep, depression, and sad memories; she told Ms. Phillips that she attended some of her daughter's volleyball games and liked to read to keep her mind busy. Ms. Phillips indicated the claimant had made minimal progress since her previous appointment but that her GAF score was 54. (R. 588–90).

On October 1, 2014, Dr. Go noted the claimant was doing well with her anxiety disorder and was not having panic attacks with help of her medication. During her October 13, 2014, therapy session with Ms. Phillips, the claimant said she was helping two elderly neighbors with appointments and errands but that they relied on her too much, causing her stress. She said she continued having bad days and suicidal thoughts, but denied any actual plans to kill herself. Ms. Phillips noted the claimant had a less somber mood, twenty severe depression symptoms according to the PHQ-9, and a GAF score of 54. On October 13, 2014, Dr. Lachman noted that seeing Ms. Phillips helped the claimant; she also noted that psychiatric medications worked well for the claimant. (R. 588–95, 600–03).

On November 21, 2014, Dr. Go again reported the claimant was doing well in terms of her anxiety disorder; was not having panic attacks with the help of her medication; was able to handle daily stressors; and suffered no negative side effects from her medication. On December 8, 2014, the claimant reported to Ms. Phillips that she was stressed about paying for the holidays and repairs to her car, as well as her elderly neighbors' son yelling at her. Ms. Phillips noted the claimant made some progress after their last meeting and that the claimant had a GAF score of 56. On January 20, 2015, Nurse Armstrong reported that the claimant's mental condition and medications were unchanged from November 21, 2014. (R. 597–99, 647–50, 672–74).

On February 23, 2015, the claimant reported to Dr. Lachman that she had lots of anger outbursts and believed Viibryd no longer worked for her. On March 2, 2015, Ms. Phillips indicated the claimant had made some progress in her condition but that she still experienced some "bad and really bad days" where she would stay in bed all day. The claimant reported spending more time with a good friend; together, they got their nails done, talked, and helped each other with some personal problems. Ms. Phillips reported the claimant had a GAF score of 56. (R. 675–79).

In his final report on the record, dated March 19, 2015, Dr. Go indicated the claimant was not having panic attacks with the help of her medication; suffered from no negative side effects; and could handle daily stressors better. (R. 684–87).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insured benefits, the claimant requested and received a hearing before an ALJ on April 15, 2015. The claimant testified that she had not worked since applying for disability on June 6, 2013. At the hearing, the claimant testified that she previously worked as a certified nursing assistant for ten years and

after that occasionally worked as a cleaner at a church. During the course of her work as a CNA, the claimant often lifted, transported, fed, and bathed patients at a nursing home facility. She lost that job when she reported to her supervisor that she could not work because of her back pain; before that she was married and did not work. She also previously worked as a cashier and on an assembly line at a florist shop making floral arrangements. After losing her CNA job in 2012, the claimant believes she was on unemployment for a year. (R. 21, 58–60, 73, 77–79).

The claimant testified that she became very depressed after losing her job and ran her car off the road in a suicide attempt in 2011. She said that she sometimes cuts herself to get "a release" of her stress and depression; she testified that she did it a couple of weeks before the hearing but had not told her therapist about it yet. The claimant then stated she is not sure her treatments for depression and anxiety are working well enough to enable her to work; that her therapist says she is not well enough to work; and that she has a lot of work to do [on her mental conditions] before she can work. She does not eat some days and will stay in bed on "bad days" about three or four times a week; however, on good days the claimant says she will eat and laugh. (R. 60–63).

The claimant indicated that she receives treatment from Dr. Go and Dr. Chindalore for osteoporosis, osteoarthritis, rheumatoid arthritis, and fibromyalgia pain. She had surgery on her left knee and was scheduled to have surgery on her right knee until she lost her job and insurance. She stated that the pain in her right knee prevents her from walking more than half a block and her left knee hurts now as well because she puts too much weight on it. She said her mom drives her around and buys her groceries. (R. 65–66).

The claimant testified that she experiences additional pain in her wrists and lower back, rating that pain a seven out of ten on a good day and a ten on a bad day; she said she hurts every day because of her fibromyalgia, arthritis, and knee pain. She also said her pain medication

makes her drowsy, and she cannot stand or sit for very long without experiencing pain. She reported that she falls a lot; that she gets up and down all day; and that she cannot sleep at night because of her pain. She testified that she has neuropathy in her hands that causes them to tingle and go numb. (R. 67–69).

When the ALJ questioned her on how long she could stand, the claimant responded, "Thirty, forty minutes. But I'd have to be moving around. I can't stand just still." She stated that she could at most lift a five pound bag of sugar. She also might drive sometimes to the convenience store a couple of miles away from her home, but could not drive further because of her wrist pain. The claimant stated that she applied but was not eligible for health insurance under the Affordable Care Act because she did not make enough money. She said her only income was $398 a month in child support and was unsure how much she received in food stamps. (R. 70–74).

A vocational expert, Dr. David W. Head, testified about the type and availability of jobs the claimant can perform. He classified the claimant's past work as a CNA as unskilled and medium or heavy as performed because she regularly lifted over a hundred pounds. The vocational expert classified the claimant's jobs cleaning at the church, working on the floral arrangement production line, and working as a cashier as unskilled, light work. The ALJ asked Dr. Head to assume for a hypothetical person with a GED and the ability to perform light work who cannot push or pull with her lower extremities; cannot climb; cannot drive; cannot work at unrestricted heights; can occasionally stoop and crouch; and is restricted to simple, non-complex, and routine tasks. (R. 81–82).

Dr. Head stated that the hypothetical individual could work as a cleaner with 5,200 jobs available in the state and 215,000 available in the national economy; as an assembly line worker

with 2,100 jobs available in the state and 130,000 nationally; and as a sorter of finished products or items to be used in further assembly with 1,850 available in the state and 93,000 nationally. When asked specifically about jobs available for the hypothetical individual as the ALJ described her but at the sedentary level, Dr. Head stated the claimant could work on an assembly line with 950 jobs available statewide and 42,000 nationally; as a system monitor with 1,300 positions in the state and 68,000 nationally; and as a telephone quote clerk with 1,100 positions in the state and 63,000 nationally. (R. 82–83).

Dr. Head stated that an individual fitting the criteria from the hypothetical would be precluded from the CNA and cashier jobs. The ALJ asked Dr. Head if the claimant could work if she could only stand and/or walk for thirty minutes at a time in addition to the previous restrictions listed. Dr. Head answered that the claimant could perform light work unless she was not able to work more than thirty minutes at a time or could not resume working within ten minutes of taking a break. With this new restriction, Dr. Head stated that the hypothetical individual could perform sedentary jobs like those he previously mentioned. He also stated that employers would have no tolerance for missing more than two days of work a month or being off task more than five percent of the time. (R. 84–85).

Finally, the ALJ asked Dr. Head if an individual who could only occasionally flex or extend her wrist bilaterally would be precluded from performing light or sedentary work. Dr. Head testified that the individual would be precluded from both light and sedentary work because both types of jobs require a person to flex their wrists and hands. (R. 85–86).

*The ALJ's Decision*

On August 21, 2015, the ALJ issued a decision finding that the claimant does not have an impairment or combination of impairments qualifying as a disability. First, the ALJ found the

claimant met the insured status requirements of the Social Security Act through December 31, 2017, and that she had not engaged in substantial gainful activity since the alleged onset of disability, June 6, 2012. (R. 32, 24).

He found that the claimant has the "severe" impairments of osteoarthritis, rheumatoid arthritis, myalgia and myositis, lumbago, neuropathy, fibromyalgia, obesity, generalized anxiety disorder, panic disorder, and depressive disorder. The ALJ also determined that the claimant has the "non-severe" impairments of migraine headaches, agoraphobia with panic disorder, dyslipidemia, and vitamin D deficiency. The ALJ determined that these "non-severe" impairments do not significantly limit the claimant's ability to perform basic work activities, but considered them in assessing the claimant's residual functional capacity. (R. 24, 32).

The ALJ next found that the claimant does not have an impairment or combination of impairments that meet or equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant meets the criteria for inflammatory arthritis in Listing 14.09 but determined that she does not have an "inability to ambulate effectively or to perform fine gross movements effectively"; does not have inflammation or deformity in one or more major peripheral joints or with one of the organ/body systems involved to at least a moderate level of severity; and does not have ankylosing spondylitis or other spondylarthropathies or manifestations of inflammatory arthritis with at least two of the constitutional symptoms or signs and one of the marked limitation in activities in daily living, maintaining social functioning, or completing tasks in a timely manner because of deficiencies in concentration, persistence, or pace. (R. 32–34).

The ALJ found that the severity of the claimant's mental impairments does not satisfy Listings 12.04 and 12.06. The ALJ found that the claimant's mental impairments cause "no more

than moderate mild restrictions" of activities of daily living, citing the claimant's own reports to the Social Security Administration that pain caused the majority of her functional problems and was the primary source of her disability. Additionally, the ALJ found that the claimant had no more than mild difficulties with concentration, persistence, or pace because of a mental impairment and had no episodes of decompensation. The ALJ based this determination on the claimant's ability to watch television, prepare small meals, care for her children, do laundry, date, help two elderly neighbors with appointments and errands, read, and attend her daughter's volleyball games. In their function reports, neither the claimant nor her mother indicated that the claimant had problems concentrating, with her memory, finishing tasks after starting them, and getting along with others. (R.33–34).

Next, the ALJ determined that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b), with no lower extremity pushing and pulling, climbing, driving, or unrestricted heights. The ALJ found that the claimant could engage in occasional stooping and crouching and that she should be restricted to simple, noncomplex, routine tasks. (R. 35).

In making this decision, the ALJ stated that he considered all of the claimant's symptoms to the extent they can be reasonably accepted as consistent with objective medical evidence and other evidence in the record. While the claimant's medically determinable impairments could be reasonably expected to cause her symptoms, the ALJ found that her medical records did not support her allegations of disabling pain. The ALJ found the claimant's testimony inconsistent with medical records and reports from her doctors. Specifically, the ALJ found that the claimant's allegation that her pain medication made her drowsy and sleepy not credible because it directly contradicted several of her doctors' reports where she made no mention of any side

effects. The ALJ also noted that the claimant's testimony about her daily activities was inconsistent with daily pain, such as preparing small meals in a microwave, cleaning the house except for vacuuming and mopping, caring for her children, visiting with others once or twice a week, attending her daughter's volleyball games, dating, helping two elderly neighbors with appointments and errands, and walking to control her weight. (R. 34–38).

The ALJ also found the claimant's testimony about her daily activities and mental impairments inconsistent with the reports of her doctors. The claimant's doctors repeatedly noted that her medications caused no negative side effects and adequately controlled her depression and anxiety. While social worker Kristy Phillips wrote a letter expressing her opinion that the claimant's mental problems prevented her from working, the ALJ found this letter inconsistent with Ms. Phillips's reports that indicated the claimant's GAF score improved from 50 to 56 over the course of treatment and that she only had "moderate symptoms." (R. 38–39).

On March 6, 2015, Dr. Chindalore indicated on the claimant's application for a disability parking pass that she believed the claimant was disabled because her arthritic conditions prevented her from walking more than two hundred feet. However, the ALJ found this opinion inconsistent with Dr. Chindalore's previous reports, as well as reports from Dr. Go and Dr. Odjegba, that the claimant was walking and exercising to manage her weight; that medication adequately addressed her pain; and the claimant's self-reported activities of doing laundry and cleaning except for mopping or vacuuming, visiting friends, preparing some small meals, and other self-care activities. The ALJ found that Dr. Chindalore's opinion in this regard warranted little weight because it was conclusory and inconsistent with other evidence in the record. (R. 40).

The ALJ stated that he evaluated the claimant's obesity and accompanying impairments in accordance with Social Security Ruling 02-1p that provides that ALJ's must assess the effect that obesity has on the claimant's ability to routinely move and perform physical activities necessary for work. He determined that the claimant's obesity was not disabling because she did not allege any disability based on her obesity and none of her physicians indicated she should have any obesity- related work restrictions. (R. 40–41).

The ALJ stated that he gave some weight to the opinion of the consultative physician, Dr. Ronald Borlaza, who, after examining the claimant, determined she could stand and walk for a maximum of four hours and lift fifty pounds occasionally and twenty-five pounds frequently despite her impairments. The ALJ did not explain why he gave the opinion only "some weight." (R. 39–40).

Finally, relying on the vocational expert Dr. Head's testimony, the ALJ found the claimant capable of performing work as a cleaner/housekeeper, sorter, and a production line worker and that those jobs were available in the state and national economies. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 42–43).

## VI. DISCUSSION

The claimant argues that the ALJ did not properly credit her subjective testimony about the limiting effects of her pain, depression, and anxiety and that substantial evidence does not support his decision. This court agrees and finds that substantial evidence does not support the ALJ's reasons for discrediting the claimant's subjective complaints.

Although the ALJ cited the Eleventh Circuit's pain standard and gave reasons why he discredited the claimant's subjective complaints about the limiting effects of her pain and mental impairments, substantial evidence does not support those reasons. *See Brown*, 921 F.2d. at 236

(substantial evidence must support the reasons the ALJ gives for discrediting the claimant's subjective testimony).

The ALJ indicated that the claimant's subjective complaints about her pain were not as severe as alleged because no doctor indicated that she had disabling pain or limitations. To the contrary, her treating rheumatologist Dr. Chindalore completed the claimant's application for a disability parking pass in March 2015 because he assessed that the claimant could walk no more than 200 feet because of her rheumatoid arthritis and other impairments. Dr. Chindalore's assessment regarding the claimant's inability to walk long distances supports the claimant's allegations regarding her pain and limitations.

The ALJ discredited the claimant's allegations regarding her walking restrictions because doctors told the claimant to walk to lose weight, and the claimant did in fact report that she did some walking. However, the claimant never indicated that she could not walk at all. Instead, she, her mother, Dr. Chindalore, and Dr. Odjegba acknowledged that the claimant could walk but only for short distances because of her pain and physical impairments. The fact that the claimant in fact did walk at times is not inconsistent with her asserted limitations regarding the short distance she can walk because of her pain.

The ALJ also pointed to records where Dr. Chindalore indicated that the claimant was doing well on medications to discount the claimant's subjective allegations regarding her pain. But the ALJ's focus on isolated incidents in the records fails to account for the claimant's qualifying statements that her pain medications work well for two hours and reduce her pain about 30%. The fact that those pain medications managed her pain for periods of time during the day does not negate that she still had pain each day that could prevent her from working a full eight-hour workday. And Dr. Chindalore characterized the claimant's impairments as moderate in severity

even on medication, but the ALJ failed to include any walking, sitting, or standing limitations in the claimant's residual functional capacity.

To discredit the claimant's subjective allegations of the limiting effects of her pain, the ALJ also noted that the claimant testified that she had difficulty sleeping, but that Dr. Go's report indicated the claimant was sleeping well. Again, the ALJ isolated a few medical records and ignored other medical records with contrary information. He "cherry picked" the record. The claimant did report to Dr. Odjegba in October 2013 that she was having difficulties sleeping. She also told her counselor Ms. Phillips in January, August, September 2014 that she had trouble sleeping, insomnia, and racing thoughts. These reports to Dr. Objegba and Ms. Phillips support the claimant's testimony at the hearing that she was having difficulty sleeping. The fact that the claimant had some occasions where she reported resting better is not inconsistent with the claimant's reports of the times she in fact struggled with insomnia.

The ALJ also stated as a reason for discrediting the claimant's subjective complaints that the claimant's activities of daily living were inconsistent with her allegations that her neuropathy, fibromyalgia, and rheumatoid arthritis caused difficulty using her wrists and hands. The claimant consistently complained of pain in her joints in her wrists and hands, and consulting examiner Dr. Borlaza noted decreased range of motion and tenderness in her wrists. The ALJ failed to mention *which* activities of daily living were inconsistent with the claimant's allegations about the limiting effects caused by the fibromyalgia and neuropathy in her hands and wrists. Without an explicit explanation as to what activities were inconsistent, the court cannot ascertain whether substantial evidence supports the ALJ's reason. *See Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (The ALJ must "articulate explicit and adequate reasons" for discrediting the claimant's subjective testimony and substantial evidence must support those explained

reasons.)  The court has reviewed the record and can find no activities of daily living that would negate the claimant's subjective allegations of limitations caused by the pain in her wrists and hands.

In attacking her allegations regarding the limiting effects of her pain, the ALJ stated that the claimant alleges significant limitations in activities of daily living but Dr. Go's records consistently indicate the claimant stated she can do her activities of daily living. The ALJ specifically cited the claimant's ability to cook mostly in the microwave; watch TV; care for her children; clean house; make her bed; attend some of her daughter's volleyball games; visit with a close friend; and help neighbors with appointments and errands as activities of daily living inconsistent with the claimant's allegations of disabling pain.  Yet, the ALJ again failed to explain how these activities are inconsistent with her subjective allegations. And what the ALJ failed to mention is that the claimant indicated that she could do some activities of daily living while on her medications *but she still has pain while doing them*.

None of these activities of daily living the ALJ cited are inconsistent with the claimant's allegations regarding the limiting effects of her physical and mental impairments.  Putting food in a microwave and watching TV are simple activities that even someone with disabling pain could do.  Her "children" are ages 15 and 18; the claimant's "care" for her older teenagers would not involve much physical activity.  The claimant did admit that she can do some cleaning, but qualified that she could not mop or vacuum, and that she could only clean for small amounts of time as she would have to take breaks because of her pain.  The claimant's admission that she can make a bed, read, and sometimes attend a volleyball game are not inconsistent with her subjective allegations of pain and limitations. The facts that the claimant visits with a close

friend occasionally and helped a neighbor with appointments and errands do not show that the claimant's pain is not as she alleges or that she can work a full eight-hour workday.

The claimant does not have to be an invalid who does absolutely nothing and never leaves her home to be disabled and unable to work full-time. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (substantial evidence did not support the ALJ's finding that the claimant's ability to do simple household chores negated her claims that she had to lie down every two hours because of her impairments); *see also Smith v. Califano*, 637 F.2d 968, 971-72 (3d Cir. 1981) ("[S]tatutory disability does not mean that a claimant must be a quadriplegic or an amputee. . . . Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. . . . It is well settled that sporadic or transitory activity does not disprove disability.") (citations and quotations omitted.)  None of the claimant's daily activities as she reported them are inconsistent with her testimony about the severity of her pain and mental limitations.  On remand, the ALJ should specifically discuss how the claimant's activities are *inconsistent* with the limitations she alleges because of her severe impairments.

Most concerning to the court is the ALJ's complete disregard of the claimant's subjective statements in 2015 about the limiting effects of her mental impairments. The ALJ discredited the claimant's subjective statements regarding her mental impairments by pointing to medical records that showed the claimant was "doing better" on her Viibryd in 2014 and that her GAF score increased from 50 to 56.  However, the ALJ seemed to ignore the claimant's medical records from February 23 and March 2, 2015, where the claimant reported to Dr. Lachman and Ms. Phillips that she had increased anger outbursts and felt that her Viibryd was no longer working for her.  The claimant also testified at the hearing that she cut herself two weeks before the hearing and the medical records reflect times when the claimant had suicidal ideations even

on her medications. Yet, the ALJ focused on the claimant's statements of improvement *in 2014* to discredit her mental limitations. Again, the ALJ cherry-picked the record. The court is bound to review the record as a whole. The ALJ did cite to places in the record, but the record as a whole does not support his conclusions. Neither the court nor the ALJ can disregard portions of the record to support the claimant's allegations.

The ALJ discounted Ms. Phillips' opinion regarding the claimant's mental limitations as inconsistent with the medical record, but again he failed to explain *how* he reached that conclusion. Ms. Phillips, the medical source that spent the most time examining and counseling the claimant, opined that the claimant was not capable of engaging in substantial gainful activity because of her major depressive disorder, panic disorder, and other medical problems. Yet, the ALJ provided for no non-exertional limitations in the claimant's residual functional capacity other than being restricted to simple, noncomplex, routine tasks.

The court concludes that substantial evidence does not support the ALJ's decision to discredit the claimant's subjective testimony about her disabling pain and mental limitations. On remand, the ALJ should explain fully the inconsistencies on which he basis the discrediting of the claimant's subjection allegations regarding the limiting effects of her pain and mental impairments.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be REVERSED AND REMANDED for action consistent with this Memorandum Opinion.

The court will enter a separate Order in accordance with the Memorandum Opinion.

DONE and ORDERED this 19th day of September, 2018.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE